UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
MICHAEL ROSE,

               Petitioner,    :     REPORT & RECOMMENDATION

        -against-     :    10 Civ. 2331 (BSJ) (MHD)

ANTHONY ZON, Superintendent,
Livingston Correctional Facility, :
and ANDREW M. CUOMO, Attorney
General of the State of New York, :

         Respondents.   :
----------------------------------x

TO THE HONORABLE BARBARA S. JONES, U.S.D.J.:

    Petitioner Michael Rose, through his counsel of record, seeks a writ of habeas corpus to challenge his 2006 conviction in New York State Supreme Court, New York County, on one count of criminal sale of a controlled substance in the third degree and one count of criminal possession of a controlled substance in the seventh degree. Petitioner was sentenced to concurrent prison terms of five years and one year, respectively, to be followed by three years of post-release supervision. On June 11, 2010, petitioner was conditionally released from prison to parole supervision.

    Petitioner asserts one ground in support of his application. He argues that the trial court's denial of an agency charge on the sale count violated his federal due-process right to a fair trial.

1

Respondents oppose the petition. They argue that the trial court's refusal to instruct the jury to consider the agency defense did not violate petitioner's right to a fair trial because there was no reasonable view of the evidence that supported an agency defense.

For the reasons that follow, we recommend that the writ be denied and the petition dismissed.

Prior Proceedings

The charges against Rose stemmed from a sale of a quantity of crack cocaine to an undercover police officer on January 14, 2006. Following the sale, the officer identified Rose as the man with whom he had just dealt, and Rose was promptly arrested. By New York County Indictment Number 290/06, he was charged with criminal sale in the third degree and criminal possession in the seventh degree.

Petitioner went to trial on June 14, 2006 before the Hon. Lewis Bart Stone, S.C.J., and a jury. At trial, the prosecution called four police officers. The officers testified that on the afternoon of January 14, 2006, a police field team attended a tactical meeting. This team included Detectives Derekson Kornegay

2

and Patrick Kelly, Undercover Officers 5565 and 24611,[1] and other members of the Manhattan South Narcotics Division. (Tr. 10-12, 58-59, 86).[2] The team was planning a buy-and-bust operation[3] covering Eighth and Ninth Avenues between 34th and 42nd Streets. (Tr. 12, 86-90). Undercover Officer 5565 was assigned to act as a buyer, and Undercover Officer 24611 was assigned to act as his "ghost," following Undercover 5565 to transmit descriptions of the individuals with whom Undercover 5565 was transacting any sales and to ensure his safety. (Tr. 9, 16, 56). Both Undercover Officers were issued two-way radios and Kel devices[4] so that they could

---

[1] At trial, Undercover Officers 5565 and 24611 were identified only by badge numbers. We maintain this convention here.

[2] The trial transcript is bound in one volume. Minutes dated June 14, 2006, covering jury selection, are paginated 1-81; minutes dated June 15, 2006, through opening statements, are paginated 1-202; minutes dated June 19-20, 2006, covering the remainder of the trial, are paginated 1-269, and are cited herein as "(Tr. __)." The sentencing minutes are dated July 13, 2006, and are cited herein as "(Sent. Tr. __)."

[3] A "buy-and-bust operation" involves a group of investigators and undercover officers who go to a location where the community has been complaining about narcotics sales. An undercover officer, posing as a drug user, attempts to purchase narcotics. If the purchase is made, the other officers move in and apprehend whoever sold the narcotics to the undercover officer. (Tr. 6-7).

[4] A Kel device is a small device that an undercover officer uses to transmit anything that the undercover officer says during an operation to a member of the field team. (Tr. 12).

communicate with the rest of the field team. (Tr. 12, 59). In addition, Detective Kornegay gave Undercover Officer 5565 a quantity of pre-recorded buy money. (Tr. 87-88).

At around 5:30 p.m. on January 14, 2006, it was cold, raining and dark. (Tr. 60, 89, 122, 184). Undercover Officer 5565 approached Luciano Vargas, whom he had never met before, near the Port Authority Bus Terminal on West 42nd Street and Ninth Avenue, told Vargas in Spanish that he had $40 to spend on crack cocaine, and asked Vargas whether anyone was selling crack cocaine. (Tr. 15-16, 19, 26, 31, 60-61, 73).

Vargas brought Undercover Officer 5565 to 42nd Street and Ninth Avenue, where petitioner was standing. (Tr. 17, 20, 36-39, 42, 73). Vargas approached petitioner and told him that Undercover Officer 5565 "needed $40." (Tr. 17, 20). Petitioner then asked the undercover officer to give him the money, and the officer gave him $40 of pre-recorded money. (Tr. 17, 18-20). The officer had never seen Rose before and did not make any arrangement with him to share the drugs that the officer was to purchase. (Tr. 19, 21, 37-38, 44).

After petitioner received the money, he told Undercover

4

Officer 5565 that it was "better off" to walk to the projects to buy the crack because the bags of crack sold there were larger and contained better-quality crack. (Tr. 20). Petitioner then led the undercover officer and Vargas to the Chelsea Houses, an apartment building about fifteen blocks away. (Tr. 20-21).

Upon reaching the Chelsea Houses, at the officer's request Rose gave the officer his knapsack, wallet, and identification card as security before going into the building to obtain the drugs. (Tr. 17, 47-48). When petitioner returned several minutes later, he handed the officer one ziplock bag of crack cocaine. (Tr. 17-18, 24, 50, 105). At that point the undercover officer made a "positive buy" signal to the ghost. (Tr. 18). Minutes later, at approximately 6:00 p.m., Detective Kelly and other members of the field team arrested both petitioner and Vargas. (Tr. 35-36, 65, 90, 119). Undercover Officer 5565 observed petitioner's arrest, and radioed Detective Kelly to confirm that petitioner was the man from whom he had just received the drugs. (Tr. 24). Detective Kelly recovered a ziplock bag of crack cocaine from petitioner's pants pocket and a small glass crack pipe from petitioner's jacket pocket at the time of his arrest. (Tr. 122).

Following the presentation of the State's case, petitioner

5

testified in his own defense. He stated that he was homeless and did not have a regular job. (Tr. 145-147). He lived in shelters, outreaches and drop-ins near the Port Authority and supported himself by assisting travelers at the Port Authority. (Tr. 146-47). On January 14, 2006, at about 4:00 p.m., he helped one passenger at the Port Authority and received a $3 tip, which he used to buy food. (Tr. 150, 162). At about 4:45 p.m., Vargas and Undercover Officer 5565 approached petitioner, and Vargas asked petitioner if he knew where to purchase crack for the undercover officer, who had $40 and a watch to sell. (Tr. 147-48). Petitioner had seen Vargas numerous times around the Port Authority attempting to "hustle" people for drugs, but petitioner did not know his name. (Tr. 147-48, 170). Petitioner testified that Vargas knew where to obtain crack cocaine. (Tr. 170).

According to Rose, he became angry with Vargas because Vargas kept asking him where to buy the drugs. (Tr. 149). At that point the undercover officer approached petitioner and told him that the crack was for his wife, who was waiting for him in their hotel room. (Tr. 148-49). Petitioner walked away from Vargas and the undercover officer. (Tr. 149). However, Vargas and the officer followed Rose for approximately twenty to twenty-five minutes, with

6

the officer repeatedly telling him that he had $40 and a watch, and that he needed drugs for his wife. (Tr. 149-50). Supposedly, Rose repeatedly told Vargas and the undercover officer to get away from him and even went outside of the Port Authority to smoke a cigarette to avoid them. (Tr. 149-59, 161-62). Petitioner also asked the officer if he was with the police, and the officer said "no." (Tr. 149). Eventually, petitioner agreed to help the stranger purchase drugs as a favor to a fellow addict and so that Vargas and the officer would stop following him. (Tr. 156). Rose confirmed that neither Vargas nor the officer had discussed with him whether he would be compensated for purchasing the drugs, and petitioner had no expectation of receiving anything in return for making the purchase. (Tr. 155).

According to Rose, he led Vargas and the officer to the Chelsea Houses at West 26th Street and Ninth Avenue, an apartment building about sixteen blocks away, where petitioner had purchased crack cocaine before. (Tr. 152, 156-57, 163-64). When they arrived, the officer asked petitioner to leave his ID and bag for security, and petitioner did so. (Tr. 152). The officer then gave Rose the

7

money, which petitioner did not count until he entered the Chelsea
Houses. (Tr. 152-53). Once petitioner counted it, he realized for
the first time that the officer had given him $50 instead of $40.
(Tr. 153).

Petitioner then went to an apartment in the Chelsea Houses
where he knew he could purchase crack cocaine. (Tr. 156-57). He
handed the $50 to the person who opened the door and, in exchange,
received three bags of crack. (Tr. 157). Petitioner had expected to
receive only two bags of crack cocaine, so he kept one bag for
himself. (Tr. 157-58, 172-73). Petitioner exited the building,
handed the officer two bags of crack cocaine, and walked away. (Tr.
158).

As petitioner walked north on Ninth Avenue, he saw the police
arrest Vargas. (Tr. 158). Moments later, the police arrested
petitioner on Ninth Avenue and 26th Street and recovered the bag of
crack cocaine, as well as a crack pipe. (Tr. 159). Petitioner did
not have any money on him when he was arrested. (Tr. 159).

At trial, defense counsel requested that the court submit an
agency charge to the jury under the theory that petitioner had
engaged in the transaction with no independent desire to promote

8

the sale of crack cocaine. (Tr. 198-211). Justice Stone declined to deliver the agency charge because petitioner had testified that he had received a benefit from the transaction without prior permission of the undercover officer. (Tr. 207-11).

On June 20, 2006, the jury returned guilty verdicts on both counts. (Tr. 266-67). On July 13, 2006, Justice Stone sentenced petitioner, as a second felony offender, to concurrent prison terms of five years on the distribution charge and one year on the possession charge, respectively, followed by three years of post-release supervision. (Sent. Tr. 3-4, 14-15).

Petitioner pursued a direct appeal to the Appellate Division, First Department. On appeal, he argued that the trial court's refusal to instruct the jury on the agency defense had deprived him of his due-process right to a fair trial. (Decl. of Ass't Att'y Gen. Lea La Ferlita, Esq., executed Oct. 29, 2010, Ex. A at 13-35). Petitioner also argued that the sentence was excessive. (Id. at 35-39).

The Appellate Division unanimously affirmed the conviction,

holding that "[t]he court properly denied [petitioner's] request for an agency charge, since there was no reasonable view of the evidence, viewed most favorably to [petitioner], that he acted solely on behalf of the buyer." People v. Rose, 58 A.D.3d 544, 544, 872 N.Y.S.2d 48, 49 (1st Dep't 2009) (citing cases). The court concluded that "there was no factual issue to be resolved by the jury regarding the agency defense," since "[n]othing in the People's evidence supported an agency defense, and [petitioner's] own testimony, even if fully credited, negates that defense." Id., 872 N.Y.S.2d at 49. The court reasoned that "[u]nder [petitioner's] version of the transaction, what began as an alleged favor developed into an opportunity for [petitioner] to profit by acquiring a third of the drugs." Id. at 544-45, 872 N.Y.S.2d at 49. The court also noted that it has "repeatedly held, on the basis of language in [People v. Lam Lek Chong, 45 N.Y.2d 64, 75, 407 N.Y.S.2d 674, 681 (1978)] as well as common sense, that [t]he defense of agency is not intended to protect a person who arranges a drug transaction for the purpose of earning the equivalent of a finder's fee or broker's commission, in contrast to a person who performs a favor, possibly rewarded by a tip or incidental benefit." Id. at 545, 872 N.Y.S.2d at 49 (citing People v. Elvy,

277 A.D.2d 80, 80, 715 N.Y.S.2d 247, 247 (1st Dep't 2000) (internal quotation marks omitted), lv denied, 96 N.Y.2d 783, 725 N.Y.S.2d 647 (2001)). Accordingly, the Appellate Division rejected petitioner's due-process claim on the merits. The Appellate Division also rejected petitioner's excessive-sentence claim, finding "no basis for reducing the sentence." Id., 872 N.Y.S.2d at 49.

Petitioner next sought leave to appeal to the New York Court of Appeals, requesting that the Court of Appeals "review all issues outlined in [petitioner's] brief." (Ferlita Decl., Ex. E at 2). Thereafter, petitioner's counsel submitted a letter supplementing petitioner's leave application (Ferlita Decl., Ex. F), and the prosecutor submitted a letter opposing it. (Ferlita Decl., Ex. G). The Court of Appeals denied petitioner's leave application on July 29, 2009. People v. Rose, 12 N.Y.3d 859, 881 N.Y.S.2d 670 (2009).

Petitioner finally turned to this court, filing his habeas corpus petition on March 16, 2010. In that petition he asserts only the due-process argument that he made to the Appellate Division.

11

ANALYSIS

A. <u>The Review Standard</u>

1. <u>The General Standard for Habeas Review</u>

The stringency of federal habeas review turns on whether the state courts have passed on the merits of the petitioner's claim, that is, whether the decision of the highest state court to consider the claim is "based on the substance of the claim advanced, rather than on a procedural, or other, ground." <u>Sellan v. Kuhlman</u>, 261 F.3d 303, 311 (2d Cir. 2001) (discussing 28 U.S.C. § 2254(d)). If the state court has addressed the merits, the petitioner may obtain relief only if the state court's ruling

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); <u>see</u>, <u>e.g.</u>, <u>Cullen v. Pinholster</u>, 131 S.Ct. 1388, 1398 (2011); <u>Bell v. Cone</u>, 535 U.S. 685, 693-94 (2002); <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000); <u>Howard v. Walker</u>, 406 F.3d 114, 121-22 (2d Cir. 2005); <u>Brown v. Artuz</u>, 283 F.3d 492,

12

497-98 (2d Cir. 2002).

Clearly established federal law "'refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.'" Howard, 406 F.3d at 122 (quoting Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002)). "[A] decision is 'contrary to' clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" Id. (quoting Williams, 529 U.S. at 413).

What constitutes an "unreasonable application" of settled law is a somewhat murkier proposition. "'A federal court may not grant habeas simply because, in its independent judgment, the "relevant state-court decision applied clearly established federal law erroneously or incorrectly."'" Id. (quoting Fuller v. Gorczyk, 273 F.3d 212, 219 (2d Cir. 2001) (quoting Williams, 529 U.S. at 411)). The Supreme Court observed in Williams that "unreasonable" did not mean "incorrect" or "erroneous," noting that the writ could issue under the "unreasonable application" provision only "if the state court identifies the correct governing legal principle from this

13

Court's decisions [and] unreasonably applies that principle to the facts of the prisoner's case." 529 U.S. at 410-13. As implied by this language, "[s]ome increment of incorrectness beyond error is required . . . . [H]owever, . . . the increment need not be great; otherwise habeas relief would be limited to state court decisions 'so far off the mark as to suggest judicial incompetence.'" Monroe v. Kuhlman, 433 F.3d 236, 246 (2d Cir. 2006) (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)); accord Richard S. v. Carpinello, 589 F.3d 75, 80 (2d Cir. 2009).

Under the Supreme Court's most recent, and arguably more stringent, interpretation of the statutory language, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S.Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "Under § 2254(d), a habeas court must determine what arguments or theories supported, or could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. Under this more recent interpretation, a federal habeas court has "authority to issue the writ in cases where there is no

14

possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." Id. In other words, to demonstrate an 'unreasonable' application of Supreme Court law, the habeas petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87.

As for the state courts' factual findings, under the habeas statute "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); McKinney v. Artuz, 326 F.3d 87, 101 (2d Cir. 2003); see generally Rice v. Collins, 546 U.S. 333, 338-39 (2006).

2. The Standard for Habeas Review in the Context of Jury Instructions

To demonstrate a violation of the constitutional due-process right to a fair trial based on a trial court's failure to give a particular jury instruction, the petitioner must show that the

15

error "so infected the entire trial that the resulting conviction violates due process." Cupp v. Naughten, 414 U.S. 141, 147 (1973). See, e.g., Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Naughten, 414 U.S. at 147); Jackson v. Edwards, 404 F.3d 612, 624 (2d Cir. 2005); Graham v. Lape, 476 F. Supp.2d 399, 404 (S.D.N.Y. 2007). The Second Circuit has defined a three-step inquiry when habeas relief is sought on the basis of a trial court's refusal to give an agency charge: (1) whether as a matter of state law petitioner was entitled to the agency charge; (2) if so, whether the trial court's failure to give the agency charge "so infected the entire trial that the resulting conviction violates due process"; and (3) if so, whether the state appellate court's subsequent affirmance of the conviction constituted an unreasonable application of clear Supreme Court law. Harris v. Alexander, 548 F.3d 200, 203 (2d Cir. 2008) (citing Davis v. Strack, 270 F.3d 111, 124 (2d Cir. 2001)). We now apply this three-step inquiry to petitioner's claim.

B. The Agency Charge was not Required under New York Law

Petitioner argues that the trial court's denial of his request for an agency charge was erroneous under New York law because the court failed to consider all of the circumstances of the drug transaction and instead focused exclusively on petitioner's retention of the one bag of crack, which petitioner argues was an "incidental benefit." (Pet'r's Mem. at 12-15; Pet'r's Reply Mem. at 3-6). The Appellate Division concluded that "[n]othing in the People's evidence supported an agency defense, and [petitioner's] own testimony, even if fully credited, negated that defense." Rose, 59 A.D.3d at 544, 872 N.Y.S.2d at 48. Respondents argue that the undisputed facts of the case established that petitioner did not behave as a mere extension of the buyer. (Resp't's Mem. at 16-24). We agree.

In deciding whether the evidence warrants a jury instruction on a particular defense under state law, federal courts "must of course defer to state-court interpretations of the state's laws so long as those interpretations are themselves constitutional." Vega v. Walsh, 258 Fed.Appx. 356, 358, 2007 WL 4426587 (2d Cir. Dec. 17, 2007) (quoting Davis, 270 F.3d at 124 n.4). Under New York law,

17

"one who acts solely as the agent of the buyer cannot be convicted of selling narcotics." People v. Andujas, 79 N.Y.2d 113, 117, 580 N.Y.S.2d 719, 722 (1992).[5] "The determination as to whether the defendant was a seller, or merely a purchaser doing a favor for a friend, is generally a factual question for the jury to resolve on the circumstances of the particular case." Lam Lek Chong, 45 N.Y.2d at 74, 407 N.Y.S.2d at 680. However, "[u]nless some reasonable view of the evidence supports the theory that [the] defendant was acting only on behalf of the buyer, the jury need not be instructed on the agency defense." People v. Herring, 83 N.Y.2d 780, 782, 610 N.Y.S.2d 949, 950 (1994).

Courts have enumerated various factors to consider in determining whether a defendant acted as an agent of a buyer. These include:

> (1) did the defendent act as a mere extension of the buyer throughout the relationship, with no independent desire to promote the transaction; (2) was the purchase suggested by the buyer; (3) did the defendant have any previous acquaintance with the seller and/or the buyer; (4) did the defendant exhibit any salesman-like behavior; (5) did the defendant use his own funds; (6) did the defendant procure from many sources for a single buyer;

---

[5] "The defense simply reflects the logical proposition that if a defendant is acting solely in a capacity which is inherently inconsistent with being a seller - i.e., acting as an agent for the buyer - he cannot be a seller." Andujas, 79 N.Y.2d at 117, 580 N.Y.S.2d at 722.

> (7) did the buyer pay the seller directly; (8) did the
> defendant stand to profit; (9) was any reward promised in
> advance.

People v. Oliver, 99 A.D.2d 789, 789, 471 N.Y.S.2d 885, 885 (2d

Dep't 1984) (quoting People v. Gonzales, 66 A.D.2d 828, 828, 411

N.Y.S.2d 632, 632 (2d Dep't 1978)).


"In reviewing defendant's request for an instruction on the

agency defense, the trial court was required to view the trial

evidence in the light most favorable to the defendant and to give

the instruction if some evidence, however slight . . . support[s]

the inference that the supposed agent was acting, in effect, as an

extension of the buyer." People v. Ortiz, 76 N.Y.2d 446, 448, 560

N.Y.S.2d 186, 187 (1990) (quoting People v Argibay, 45 N.Y.2d 45,

55, 407 N.Y.S.2d 664, 669 (1978)). However, "[if] no reasonable

view of the evidence supports a finding of the defense, the issue

need not be submitted to the jury." Id., 560 N.Y.S.2d at 187.


In cases in which an undercover officer approaches a stranger

on the street and that person acts in a manner indicating a

relationship with a drug dealer, the courts have held repeatedly

held that an agency charge is not required, because the evidence is

inconsistent with the notion "that defendant agreed to participate

in [the] crime only because he wished to serve as an agent of the

buyer." Herring, 83 N.Y.2d at 782, 610 N.Y.S.2d at 950; see also, e.g., Ortiz, 76 N.Y.2d at 450, 560 N.Y.S.2d at 188; People v. Tejada, 249 A.D.2d 208, 208-09, 671 N.Y.S.2d 755, 756 (1st Dep't 1998), appeal denied, 92 N.Y.2d 906, 680 N.Y.S.2d 71 (1998); People v. Lopez, 220 A.D.2d 203, 204, 632 N.Y.S.2d 7, 7 (1st Dep't 1995), appeal denied, 88 N.Y.2d 938, 647 N.Y.S.2d 171 (1996). In this regard, the New York Court of Appeals has emphasized that the charge will not be given unless the evidence is "indicative of a relationship with the buyer" and does not serve to "merely raise ambiguities about the defendant's connection to the seller". Herring, 83 N.Y.2d at 783, 610 N.Y.S.2d at 950. Thus, even if the defendant is found not to have received any money, the instruction will be withheld absent affirmative proof of a relationship with the buyer. See, e.g., id. at 782, 610 N.Y.S.2d at 950 (defendant may be deemed seller even without compensation); People v. Garcia, 211 A.D.2d 498, 498-99, 621 N.Y.S.2d 330, 331 (1st Dep't 1995), appeal denied, 85 N.Y.2d 938, 627 N.Y.S.2d 1000 (1995) (lack of possession of drugs or money does not justify agency charge).

The evidence in this case indicated no relationship with the undercover officer who was acting as a buyer, and hence offered no basis for an agency instruction. Petitioner argues that a profit motive on his part does not, by itself, defeat the agency defense,

20

which is available even when the defendant received some "incidental benefit" from the buyer (although, as petitioner points out, "acceptance of a 'substantial reward' may show that the defendant was not acting solely for the buyer."). (Pet'r's Mem. of Law at 13 (quoting <u>Lam Lek Chong</u>, 45 N.Y.2d at 75, 407 N.Y.S.2d at 681)). Thus, petitioner argues, he should be considered an agent of the officer because the third bag of cocaine he retained was merely an "incidental benefit" of his agency, and not evidence that he was acting as a seller of drugs. (Pet'r's Mem. at 13-15). However, as petitioner himself pointed out in his memorandum, the Appellate Division has previously stated that retention of a significant portion of the pre-recorded buy money involved in the transaction cannot be perceived as an "incidental benefit," and instead indicates that the defendant was acting on his own behalf. (Pet'r's Mem. at 14 (citing, <u>inter alia</u>, <u>People v. Williams</u>, 289 A.D.2d 62, 62, 733 N.Y.S.2d 428, 428 (1st Dep't 2001) (defendant's retention of forty percent of pre-recorded buy money "cannot be characterized as a tip or incidental benefit" in the context of the agency defense)). In this case, petitioner testified that he retained one-third of the cocaine, or roughly thirty-three percent of the transaction value. This is closer to a "substantial reward" than an

"incidental benefit," and hence does not require instruction on the agency defense.

Moreover, in the cases cited by petitioner that held that the receipt of some incidental benefit itself does not preclude an agency charge, the defendants received an incidental benefit with the buyers' consent. See, e.g., Lam Lek Chong, 45 N.Y.2d at 75-76, 407 N.Y.S.2d at 680-82; People v. Miano, 143 A.D.2d 777, 777-78, 533 N.Y.S.2d 309, 309-11 (2d Dep't 1988); People v. Kirk, 143 A.D.2d 683, 685, 532 N.Y.S.2d 925, 926 (2d Dep't 1988). In this case, however, petitioner unilaterally decided to keep one-third of the purchased cocaine without the undercover officer's knowledge. (Tr. 153-58, 199-211). Therefore, the retained third bag of cocaine cannot be considered a "share, a tip or reimbursement for expenses [offered by the buyer] as a token of friendship or appreciation for the favor." Lam Lek Chong, 45 N.Y.2d at 75, 407 N.Y.S.2d at 681. The Appellate Division correctly concluded that "[u]nder [petitioner's] version of the transaction, what began as an alleged favor developed into an opportunity for [petitioner] to profit by acquiring a third of the drugs." Rose, 58 A.D.3d at 544-45, 872 N.Y.S.2d at 49.

Petitioner also cites People v. Spradley, where the defendant retained a portion of crack cocaine purchased for an undercover

officer without the officer's knowledge, and the court gave the jury an agency-defense instruction. (Pet'r's Mem. at 15 (citing People v. Spradley, 249 A.D.2d 339, 670 N.Y.S.2d 882 (2d Dep't 1998)). Petitioner argues that the trial court should have given the agency charge because this case has "a substantially similar fact pattern" with Spradley. (Id.). We do not agree. In Spradley, defendant testified that before agreeing to purchase the drug, she had asked the undercover officer whether she could get something out of the transaction and the officer agreed. 249 A.D.2d at 340, 670 N.Y.S.2d at 884. Therefore, it was reasonable for the defendant in Spradley to assume that the small portion she retained was an "incidental benefit" offered by the undercover officer based on their previous conversation regarding the compensation. In Rose's case, however, he did not discuss anything regarding compensation with the undercover officer before or after he took the third bag of the cocaine and left. Therefore, Spradley is inapplicable here.

Petitioner further argues that consideration of all relevant factors entitled him to an instruction on the agency defense. (Pet'r's Mem. at 15-22; Pet'r's Reply Mem. at 6-8). However, as we have pointed out, the New York Court of Appeals has emphasized that the charge will not be given unless the evidence is "indicative of

23

a relationship with the buyer" and does not serve to "merely raise ambiguities about the defendant's connection to the seller". Herring, 83 N.Y.2d at 783, 610 N.Y.S.2d at 950. The other factors discussed by petitioner at most raise some ambiguities about petitioner's connection to the seller, but do not tend to establish an agency relationship with the undercover officer. Thus, the trial court correctly withheld the instruction in the absence of affirmative proof of a relationship with the buyer.

For example, petitioner notes that he did not initiate the purchase, and thus argues that he was acting solely in the interest of the buyer, which would support the agency defense. (Pet'r's Mem. at 15-16). However, that fact is not affirmative proof of a relationship with the buyer. The cases are legion in which drug sellers and their agents wait in public to be approached by a buyer. Indeed, the cases cited by petitioner illustrate that a defendant who did not initiate the purchase is not, based on that fact, entitled to an agency charge. For example, in Ortiz, 76 N.Y.2d 446, 560 N.Y.S.2d 186 (cited in Pet'r's Mem. at 8), the court ruled that the agency defense had been correctly denied even though the defendant had not initiated the purchase, instead helping the seller by directing buyers to the selling place. Id. at 449-50, 560

24

N.Y.S.2d at 187-88. Similarly, in <u>Argibay</u>, 45 N.Y.2d at 54-55, 407 N.Y.S.2d at 668-69 (cited in Pet'rs. Mem. at 16), the court distinguished between two defendants, neither of whom initiated the purchase. One of the defendants, Di Guiseppe, "became involved when his brother received a telephone call from an undercover officer," and ultimately "brought them to Argibay's [the other defendant] apartment." <u>Id.</u> at 54, 407 N.Y.S. 2d at 668-69. Di Giuseppe was not paid directly, although he did receive a small quantity of drugs as compensation, and the court noted that "a jury charge on agency was probably indicated." <u>Id.</u> at 55, 407 N.Y.S.2d at 669. Argibay, on the other hand, sold a significant quantity of narcotics, which he received from his supplier while the undercover officers were in his apartment. <u>Id.</u> at 53, 407 N.Y.S. 2d at 668. Although it could be said that he was an "middleman" or "broker" between the officers and the ultimate supplier, <u>id.</u>, 407 N.Y.S.2d at 668, and he clearly did not initiate the purchase, the court ruled that "no charge to the jury on agency was necessary or appropriate." <u>Id.</u> at 54, 407 N.Y.S.2d at 668. Thus, the fact that petitioner did not initiate the drug purchase in this case does not save petitioner's claim.

Petitioner also notes that he was not promised a reward for the transaction, and he asserts that this fact favors the agency defense. (Pet'r's Mem. at 16-17). This is plainly not true.

25

Moreover, by unilaterally deciding to keep one-third of the cocaine purchase without the knowledge of the undercover officer, petitioner did not act as a "mere extension" of the buyer. Had he discussed any possible compensation with the undercover officer before the purchase, as the defendant did in <u>Spradley</u>, or asked for permission to share the drugs after the purchase, he would have behaved in a way potentially favoring the agency defense. He did not do so, and thus his argument on this point is meritless.

Petitioner further argues that the lack of any evidence that he had developed a working relationship with the seller favors the agency charge. (Pet'r's Mem. at 22-23). However, petitioner testified that he had purchased from the same seller several times before. (Tr. 156-67). Although there was no direct evidence to prove that the seller gave petitioner a bag of cocaine as a commission, the charge was correctly denied because the evidence was not "indicative of a relationship with the buyer" and "serve[d] to merely raise ambiguities about the defendant's connection to the seller." <u>Herring</u>, 83 N.Y.2d at 783, 610 N.Y.S.2d at 950.

Petitioner further argues that although "the purchase of drugs from a single source is sometimes inconsistent with agency, it does

not defeat the agency defense." (Pet'r's Mem. at 19). Petitioner testified that he led the undercover officer sixteen blocks away from the site of their encounter to purchase the cocaine because that was the only place he knew to buy drugs. (Tr. 156-57, 163-64). Again, even if we give full credit to petitioner's testimony, it did not demonstrate that he acted as the buyer's agent and was more consistent with his going to his regular source of drugs, which again militates against an agency relationship with the buyer.

Finally, petitioner argues that he did not engage in any salesman-like behavior and did not purchase the drugs with his own funds, and that these are factors favoring the agency defense. (Pet'r's Mem. at 17-19). Although these two factors arguably favor the notion of a buyer's agent, this is simply insufficient to require an agency charge. In determining whether an agency charge is necessary, the court must consider the totality of the circumstances, and "the mere coincidence of one or more of these factors is insufficient" to compel the granting of the agency defense. People v. Simpson, 85 A.D.2d 306, 310, 448 N.Y.S.2d 170, 173 (1st Dep't 1982); see also Ortiz, 76 N.Y.2d at 448, 560 N.Y.S.2d at 187 (court must give agency instruction if "some evidence, however slight . . . support[s] the inference that the supposed

27

agent was acting, in effect, as an extension of the buyer . . .
[w]here, however, no reasonable view of the evidence supports a
finding of the defense, the issue need not be submitted to the
jury.") (citing cases) (internal citations omitted).

In sum, considering the totality of the circumstances in this
case, the trial court correctly withheld the agency charge. Even
viewed in the light most favorable to the petitioner, the evidence
shows that petitioner led an undercover officer -- a complete
stranger -- to a place sixteen blocks away from their initial
encounter, purchased drugs purportedly for the officer, and without
the knowledge or consent of the officer retained one-third of the
purchased cocaine. This record contains no affirmative proof of an
agency relationship between petitioner and the buyer.

Finally, we note that the Appellate Division's decision on a
question of New York law is entitled to substantial deference. See,
e.g., Baker v. Health Management System, Inc., 298 F.3d 146, 149 (2d
Cir. 2002); Allstate Ins. Co. v. Serio, 261 F.3d 143, 150 (2d Cir.
2001). Hence, even if the testimony here had presented a closer

question on the correctness of the panel's decision on this issue,
we would be obliged to defer to that decision in the absence of any
compelling reason to conclude that it clearly erred.

C. <u>The Trial Court's Refusal to Give an Agency Charge did not
Violate Petitioner's Due-Process Right to a Fair Trial</u>

Petitioner further argues that the trial court's refusal to
give an agency instruction violated his constitutional right to due
process because it "so infected the entire trial that the resulting
conviction violated due process." (Pet'r's Mem. at 23; Pet'r's Reply
Mem. at 8-9 (quoting <u>Naughten</u>, 414 U.S. at 147). We disagree.

A defendant's due-process rights are violated when the trial
court's refusal to give a jury instruction to which the defendant
was entitled was "sufficiently harmful to make the conviction
unfair." <u>Naughten</u>, 414 U.S. at 147. However, "[d]ue process does not
require the giving of a jury instruction when such a charge is not
supported by the evidence." <u>Banks v. Conway</u>, 2009 WL 5103123, at *10
(S.D.N.Y. Dec. 17, 2009) (citing <u>Blazic v. Henderson</u>, 900 F.2d 534,
541 (2d Cir. 1990)). As discussed, the trial court correctly ruled

that petitioner was not entitled to an agency charge under New York law. Therefore, the court's refusal to give an agency instruction to the jury did not violate petitioner's due-process rights. Id.

Petitioner, in making his due-process argument, relies heavily upon the Second Circuit's decision in Harris v. Alexander. 548 F.3d 200. Accordingly, we believe it helpful to address the inapplicability of Harris in light of the facts of this case. In Harris, the petitioner challenged his conviction for possession of a controlled substance with intent to sell, arguing that the trial court's refusal to charge the jury on the agency defense had violated his due-process right to a fair trial. The State had presented evidence that a police officer conducting surveillance on the roof of a building had observed activities that he believed to be consistent with narcotics transactions: (1) two men approached Harris, who appeared to show them glassine bags, and shook their heads and walked away; (2) then another man approached Harris and handed him what appeared to be currency, and Harris handed the man a small object, after which "the man entered the vestibule of a nearby business and proceeded to smoke what the officer assumed to be dope purchased from Harris." Id. at 202. Harris was arrested in possession of seventeen bags of crack cocaine and $56 cash. Id. The State also offered Harris' grand-jury testimony, in which he

30

testified that he had purchased twenty bags of crack cocaine with his own money ($45-$50) and the money of a female companion ($175), a prostitute, with whom he had made an arrangement to meet later and to share the drugs, and with whom he had made similar arrangements before. Id. Harris smoked three of the 20 bags of crack cocaine prior to his arrest. Id. After his arrest he denied that he had sold drugs or offered them for sale and insisted that he had intended only to share the drugs with his friend, who had gotten him to buy them in the first place. Id.

Based on this testimony, the Second Circuit upheld the decision of the district court to grant habeas relief, concluding that there existed a disputed issue of fact for the jury to resolve concerning whether Harris was a seller (based on the testimony of the police officer), or an agent for the buyer (based on Harris' grand-jury testimony that he was not selling drugs, but instead, was purchasing drugs that he had arranged beforehand to share with his female friend). Id. at 205-06. The Court also pointed out that the three packets smoked by Harris before his arrest could either be viewed "as purchased by him with his own money for his own use" or "constituted a benefit [his companion] paid him for his agency service," assuming that they intended to share the remainder when they met later. Id. at 205. Thus, the Second Circuit held that the

31

trial court's refusal to give the agency charge was "catastrophic," because "[i]t converted a reasonable possibility of acquittal into a virtual directed verdict of conviction." Id. at 206.

In contrast, the Appellate Division in this case correctly stated that "there was no factual issue to be resolved by the jury regarding the agency defense." Rose, 53 A.D.3d at 544, 872 N.Y.S.2d at 48. Even viewed in the light most favorable to petitioner, the evidence in this case clearly demonstrated that petitioner had not used his own money to purchase the cocaine, that he had never made any similar arrangements with the undercover officer in the past to share the purchased drugs, and that he had not arranged to meet with the undercover officer and share the drugs later. Each of these facts serves to distinguish this case from Harris. Therefore, unlike in Harris, there was no basis to assume that the cocaine retained by petitioner was a benefit that the buyer had agreed to give him. Indeed, as we have already noted, there was no reasonable view of the evidence in our case that could support an agency defense. As a result, Harris is inapplicable.

D. The Appellate Division's Decision was Neither Contrary to, Nor an Unreasonable Application of, Supreme Court Precedent

Finally, petitioner argues that a writ of habeas corpus should be granted because the state court's decision is an unreasonable application of clearly established federal law and is based on an unreasonable factual determination. (Pet'r's Mem. at 25-27; Pet'r's Reply Mem. at 8-10 (citing 28 U.S.C. § 2254(d)). As discussed above, we do not find any basis to conclude that the trial court's refusal to charge the jury on the agency defense was improper under New York law, much less denied petitioner his right to a fundamentally fair trial. The Appellate Division correctly noted that "there was no factual issue to be resolved by the jury regarding the agency defense," Rose, 53 A.D.3d at 544, 872 N.Y.S.2d at 48, and correctly affirmed the conviction. Thus, petitioner's claim must be rejected, as he fails to demonstrate a violation of a federal constitutional right.

CONCLUSION

For the reasons noted, we recommend that the writ be denied and

33

the petition dismissed with prejudice.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Barbara S. Jones, Room 1920, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985), reh'g denied, 474 U.S. 1111 (1986); DeLeon v. Strack, 234 F.3d 84, 86 (2d Cir. 2000) (citing Small v. Secretary of Health and Human Services, 892 F.2d 15, 16 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


DATED: New York, New York
       May 4, 2011

34

Respectfully Submitted,


_____
**MICHAEL H. DOLINGER**
**UNITED STATES MAGISTRATE JUDGE**


Copies of the foregoing Report and Recommendation have been mailed this date to:

Lea L. La Ferlita, Esq.
Assistant Attorney General
120 Broadway
New York, New York 10271

Joseph F. Tringali, Esq.
Patrick T. Shilling, Esq.
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017

David Crow, Esq.
The Legal Aid Society
Criminal Appeals Bureau
199 Water Street, 5th Floor
New York, New York 10038